UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Clyde Boone,

        Plaintiff,

  v.

Jon Juenger and Mower County, Minnesota,

        Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 05-641 ADM/AJB

Mary Ruth Hartman,

        Plaintiff,

  v.

Jon Juenger and Mower County, Minnesota,

        Defendants.

Civil No. 05-1873 ADM/AJB

_____

Robert J. Hajek, Esq., and Donald L. Beauclaire, Esq., Hajek, Meyer & Beauclaire, PLLC, Minneapolis, MN, argued for and on behalf of Plaintiffs.

Jason M. Hiveley, Esq., Iverson Reuvers, LLC, Bloomington, MN, argued for and on behalf of Defendants.

_____

## I. INTRODUCTION

On June 2, 2006, oral argument before the undersigned United States District Judge was heard on the Motions for Summary Judgment of Defendants Jon Juenger ("Juenger") and Mower County ("Mower County") (collectively, "Defendants") [Docket No. 14 (Civil No. 05-641), Docket No. 11 (Civil No. 05-1873)]. In their Complaints [Docket No. 1 (Civil No. 05-641), Docket No. 1 (Civil No. 05-1873)], Plaintiffs Clyde Boone ("Boone") and Mary Ruth Hartman ("Hartman") allege the Defendants violated their constitutional rights. Defendants' Motions are granted.

## II.  BACKGROUND

On February 24, 2002, Plaintiff Hartman spoke on the telephone with her friend Gidget Tjepkes ("Tjepkes"), and agreed to meet Tjepkes at her home in Racine, Minnesota.  Hartman Dep. (Hiveley Aff. [Docket No. 18 (Civil No. 05-641), Docket No. 16 (Civil No. 05-1873)] Ex. A) at 60-62.  En route to Tjepkes' home, Hartman received a cell phone call warning from Tjepkes that there was a semitruck in the road near the Kraft Game Farm.  Id. at 63, 67-68.  Hartman was concerned because she had allegedly received death threats from Kenneth and Nancy Kraft (collectively, the "Krafts"), the owners of the Kraft Game Farm.  Id. at 62-63.  Hartman then contacted Plaintiff Boone and asked if he would ride with her to Tjepkes' home.  Id. at 62, 70; Boone Dep. (Hiveley Aff. Ex. B) at 17-18.  Boone agreed, and Hartman drove to Boone's house to pick him up.  Hartman Dep. at 62; Boone Dep. at 21-22.

Before Hartman arrived at Boone's residence, Boone asked his son, Chad Boone, to drive to the Kraft Game Farm and photograph the semitruck's license plate.  Hartman Dep. at 70; Boone Dep. at 19-20.  As Hartman and Boone approached Tjepkes' home in Hartman's car, they observed Chad Boone's vehicle near the Kraft Game Farm driving by the semitruck, and saw two individuals approach Chad Boone's vehicle.  Hartman Dep. at 64-65; Boone Dep. at 22-23.  Tjepkes was also able to observe the incident from her house, and she dialed 911 in response.  Hartman Dep. at 65.  Chad Boone then contacted Plaintiff Boone to discuss the incident.  Hartman Dep. at 66-67; Boone Dep. at 23-24.  Following that conversation, Boone asked Hartman to follow the semitruck to get the license plate number.  Hartman Dep. at 69.  Hartman believed they needed to get the license plate number for the Mower County deputy responding to Tjepkes' 911 call.  Id.

Shortly after Hartman and Boone began following the semitruck into Racine, the

2

semitruck turned around. Id. at 71-72. In response, Hartman turned onto a side street to observe the semitruck. Id. at 72; Boone Dep. at 28. After it passed her car, Hartman again pursued the semitruck as it left Racine. Hartman Dep. at 73; Boone Dep. at 28-29. While following the semitruck, Boone received a call from Chad Boone, who was with Grand Meadows Police Officer Mike Gehrke. Hartman Dep. at 73-74. Hartman alleges that Officer Gehrke told Chad Boone to ask Boone to maintain visual contact with the semitruck. Id. Boone and Hartman did so, following the semitruck all the way to Chester, Iowa. Boone Dep. at 30-32. Boone admits that he and Hartman in their pursuit to maintain visual contact with the semitruck occasionally reached speeds which approached 80 miles per hour. Boone Dep. at 30-32. Hartman admitted traveling at least 72 miles per hour while following the semitruck. Hartman Dep. at 77-78.

On the same evening of February 24, 2002, Defendant Juenger was dispatched to the Kraft Game Farm in response to a complaint from Kenneth Kraft ("Kraft"), one of the owners of the Kraft Game Farm. Juenger Dep. (Hiveley Aff. Ex. C) at 31, 74-75. Juenger later prepared an incident report of his investigation. Id. at 44-45, Ex. 3. Juenger's report includes a summary of information provided by Kraft. Id. at 74-78, 104-07, Ex. 3. Kraft later confirmed the general accuracy of this information during Hartman's criminal trial.[1] Id. Ex. 2; Omnibus Hearing Transcript (Hiveley Aff. Ex. D) at 49-56. On the evening of February 24, 2002, after Juenger arrived in response to Kraft's complaint, Kraft told him that the semitruck was driven by Craig Perry ("Perry"). Juenger Dep. Ex. 3; Omnibus Hearing Transcript at 49-56. Kraft and Perry observed individuals taking photographs of the semitruck's license plates. Id. Perry and his

---

[1] There is one discrepancy between Juenger's report and the testimony of Kraft and the others involved in the incident. While Juenger's report discusses just one vehicle, the testimony of all involved discuss both Chad Boone and Hartman's vehicles.

passenger, Court Garloff ("Garloff"), went to the semitruck, intending to leave the area. Id. As they neared Perry's semitruck, a car began driving up the street towards the semitruck. Id. Garloff began to approach the car, but it drove off quickly as he neared the car. Id. Perry and Garloff then left in the semitruck, heading east on County Road 1. Id. Realizing they were traveling the wrong direction, Perry turned the semitruck around. Id. As the semitruck passed the Kraft Game Farm, Kraft observed a car he believed belonged to Hartman following the semitruck. Id.

Juenger's report also recounts Perry's version of the incident, which echos Kraft's account. Juenger Dep. Ex. 3, Omnibus Hearing Transcript at 39-42. Garloff also confirmed the account as related in Juenger's report. Id.; Hartman Trial Transcript (Hiveley Aff. Ex. E) at 108-129. While at the Kraft Game Farm, Garloff and Perry both observed flashes of light near the semitruck. Id. Fearing the flashes may have been gun shots, Garloff and Perry went to the semitruck to inspect it for damage. Id. Garloff and Perry, as did Kraft, reported that a car approached the semitruck, but sped off as it approached Garloff. Id. They also reported a second car passed the semitruck and pulled into a driveway a short distance away. Id. After turning the semitruck around, Garloff and Perry again noticed this car parked on a side street in Racine. Id. After traveling south on Highway 63 towards Iowa, Garloff and Perry once again saw the second car approach them from behind at a high rate of speed. Id. Perry accelerated his truck to determine whether the car would continue following, which it did, up to speeds between 70 and 80 miles per hour. Id. Finally, as the truck reached Iowa, Garloff and Perry saw police officers on the side of the road. Id. Perry pulled over and approached the officers for assistance. Id. Hartman's car also pulled over.

Juenger's report relates a conversation with Howard County Sheriff's Deputy Darwin

Kueker ("Kueker").  Juenger Dep. Ex. 3; Hartman Trial Transcript 192-97, 201-03.  Kueker stated that on February 24, 2002, he was dispatched to Highway 63 to check out a report of a semitruck traveling at a high rate of speed with a car following close behind.  Id.  Upon arriving at the scene, Kueker learned that the semitruck driver had pulled over when another law enforcement officer was seen on the side of the road.  Id.  At the scene of the stop, Kueker spoke with Hartman and Boone, the occupants of the vehicle.  Id.  Hartman expressed the opinion that the semitruck was hauling illegal animals.  Id.  Kueker inspected the semitruck, but did not find the animals identified by Hartman.  Id.

Following the incident, Hartman was charged with stalking, reckless driving, careless driving, and speeding.  Compl. (Civil No. 05-1873) ¶ 2.  The criminal complaint was received by mail, therefore, Hartman was never physically arrested.  Hartman Dep. at 82-83.  Hartman was acquitted of all charges by a jury.  Compl. (Civil No. 05-1873) ¶ 3.  Boone was charged with stalking and aiding and abetting stalking.  Compl. (Civil No. 05-641) ¶ 4.  He also received his criminal complaint by mail.  Boone Dep. at 44.  The county attorney assigned to Boone's case agreed to continue the charges against Boone for one year, after which they were dismissed.  Compl. (Civil No. 05-641) ¶ 5.  The criminal complaints against Hartman and Boone were signed by Minnesota District Court Judge Fred W. Wellman, who determined that probable cause existed to charge Hartman and Boone with the offenses listed above.  Juenger Dep. Exs. 11-12.

## III. DISCUSSION

A.   **Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

B.   **42 U.S.C. § 1983**

Plaintiffs first allege a cause of action predicated upon 42 U.S.C. § 1983 against Defendants. "Section 1983 imposes liability for certain actions taken 'under color of' law that deprive a person 'of a right secured by the Constitution and laws of the United States.'" Dossett v. First State Bank, 399 F.3d 940, 947 (8th Cir. 2005), quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 931 (1982). Plaintiffs claim they were deprived of their constitutional rights of equal protection, due process, fair trial, and the right to be free from unreasonable searches and seizures based upon Officer Juenger's allegedly false police report. Plaintiffs argue that Juenger intentionally falsified his police report to make it appear as if only one car – Hartman's – was

involved in the incident on the evening of February 24, 2002, when in fact Chad Boone's car also was involved. Plaintiffs aver they were charged based on this alleged intentional falsification.

### 1.     Jon Juenger

Defendant Juenger argues that summary judgment should be granted on Plaintiffs' § 1983 claim against him in his individual capacity because he is charged only in his official capacity and is subject to qualified immunity.[2] It is well established that a lawsuit against an individual acting in his official capacity is equivalent to a lawsuit against the employer only. Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999). The Eighth Circuit has held that to sue a public official in his individual capacity, "a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity." Id. Furthermore, the Eighth Circuit has suggested that plaintiffs employ the following language when attempting to sue all defendants in their individual capacity: "Plaintiff sues each and all defendants in both their individual and official capacities." Nix v. Norman, 879 F.2d 429, 431 (8th Cir. 1989) (citation omitted). Here, the Complaints' captions do not state whether Juenger is being sued in his individual capacity, official capacity, or both, listing only Jon Juenger's name. Moreover, nothing in the Complaints indicate Juenger is being sued in his individual capacity. As a result, Defendants' Motions must be granted as to claims against Juenger as an individual.

---

[2] Defendants also argue that because Plaintiffs did not specifically list which amendments to the Constitution were violated, they have failed to properly assert a § 1983 action. However, Plaintiffs' Complaints state well established constitutional violations. For purposes of this motion, the Court will assume Plaintiffs have adequately alleged these violations.

Even assuming that Juenger has been properly named in his individual capacity, the doctrine of qualified immunity applies to shield Juenger from liability. "Under the doctrine of qualified immunity, state actors are protected from civil liability when 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Sexton v. Martin, 210 F.3d 905, 909 (8th Cir. 2000), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To establish immunity, a constitutional violation must be demonstrated. Id. Second, it must be determined whether the constitutional right was "clearly established" at the time of the alleged violation. Id.

Here, Plaintiffs cannot demonstrate that their constitutional rights have been violated. Their sole contention is that the alleged falsified report of Juenger led to violations of their right to equal protection, due process, fair trial, and the right to be free from unreasonable searches and seizures. However, no facts establish any of these claims. Specifically, Plaintiffs allege Juenger neglected to differentiate between Chad Boone and Hartman's vehicles in his police report, making it appear as if Hartman's car was involved both with taking pictures of the semitruck's license plates outside the Kraft Game Farm and following the semitruck to Iowa, when in reality, Hartman's car was only involved in the high speed chase to Iowa. However, the facts are insufficient to demonstrate this theory. Although admitting that the police report does err in this respect, Plaintiffs have no evidence that Juenger intentionally falsified the report. Both Plaintiffs admitted that they do not know if Juenger falsified the report, or if he received false information from his sources. Hartman Dep. at 106-09; Boone Dep. at 41-44. As there is no other evidence of intentional falsification, no reasonable jury could conclude that was the case. As Plaintiffs' claims of constitutional violations rest on this theory, Defendants' Motions

8

must be granted.

Even if evidence existed to demonstrate that Juenger intentionally filed a false report, Plaintiffs can not succeed, because probable cause for their arrest existed based on conduct they admit occurred that evening. Hartman and Boone admitted to following the semitruck into Racine, then chasing it all the way to Iowa at speeds up to 80 miles per hour. Moreover, although they did not take pictures of the semitruck outside the Kraft Game Farm, they were in communication with another driver that did so. These undisputed facts are sufficient to establish probable cause of the charges against Defendants. In the context of qualified immunity, "the issue is 'not probable cause in fact but 'arguable' probable cause.'" Gorra v. Hanson, 880 F.2d 95, 97 (8th Cir. 1989), quoting Floyd v. Farrell, 765 F.2d 1, 5 (1st Cir. 1985). Probable cause exists when police "reasonably could have believed that a crime had been committed by the person to be [charged or] arrested." State v. Olson, 436 N.W.2d 92, 94 (Minn. 1989). Here, at a minimum, Plaintiffs stopped to observe the semitruck, followed it into town and as it reversed course, and then chased it at speeds approaching 80 miles per hour all the way to the Iowa border. This is sufficient for Juenger to reasonably believe that the crimes charged were committed and for him to present a criminal complaint which was approved by the reviewing judicial officer. As a result, Plaintiffs can not demonstrate that any of their constitutional rights were violated. Defendants' Motions are granted.

**2.    Mower County**

As a general matter, municipalities are not subject to respondeat superior or vicarious liability under § 1983. Monell v. Department of Social Servs. of the City of New York, 436 U.S. 658, 694 (1978). However, a municipality can be held liable for its own wrongs when the

enforcement of a policy or practice of the municipality results in the deprivation of federally protected rights. Id. at 694. To demonstrate Mower County's liability under a Monell claim, Plaintiffs must show that a policy or custom of Mower County was the "moving force [behind] the constitutional violation." Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999) (citation omitted).

Plaintiffs claim that Mower County had a policy and custom of protecting Kenneth and Nancy Kraft, the operators of the Kraft Game Farm, from illegal acts relating to the operation of the Kraft Game Farm.[3] This argument fails for multiple reasons. First, Plaintiffs have raised this argument for the first time in their opposition brief in contradiction of their own deposition testimony. The only facts cited to support the new claims are found in the affidavits of the Plaintiffs filed with the brief. Hartman Aff. [Docket No. 30 (Civil No. 05-641), Docket No. 20 (Civil No. 05-1873)] ¶¶ 2-25; Boone Aff. [Docket No. 29 (Civil No. 05-641), Docket No. 19 (Civil No. 05-1873)] ¶¶ 2-10. These affidavits detail incidents in which various Mower County officials allegedly falsified police reports and took other actions to protect the Krafts from being charged with illegal activities. The Eighth Circuit, however, has held that "affidavit[s] filed by the plaintiff[s] in opposition to a motion for summary judgment that directly contradict[] the plaintiff's previous deposition testimony [are] insufficient to create a genuine issue of material fact under Rule 56." City of St. Joseph, Mo. v. Southwestern Bell Tel., 439 F.3d 468, 475 (8th Cir. 2006). In the Plaintiffs' depositions, when specifically queried about customs and policies of Mower County, neither mentioned this "protection" theory as their claim. Hartman Dep. at

---

[3] Any alleged policy of "protection" of the Krafts proved ineffective. Both Kenneth and Nancy Kraft were convicted in federal court in 2005 of Lacey Act violations related to the operation of the Kraft Game Farm.

10

96-97; Boone Dep. at 48. Because the affidavits raise new issues filed solely in response to Defendants' Motions, the affidavits can not support the existence of a factual dispute.

Even if the facts in the affidavits are considered, Plaintiffs have failed to demonstrate a factual dispute over whether a policy or custom of Mower County contributed to the violation of their constitutional rights. The Plaintiffs have not explained how, nor provided any facts allowing an inference that, protecting the Krafts from legal ramifications adversely affected Plaintiffs' constitutional rights. None of the incidents raised in the affidavits of the Plaintiffs regarding the alleged protection of the Krafts demonstrate a violation of Plaintiffs' constitutional rights. Moreover, because the Plaintiffs have admitted to facts providing probable cause to support the charges brought against them for the events occurring on the night of February 24, 2002, the arrest incident also does not support a constitutional violation. As a result, Defendants' Motions are granted.

**C.    State Law Claims**

Both Plaintiffs allege a count of abuse of process against Mower County.[4] To establish a prima facie case of abuse of process, a plaintiff must demonstrate "the existence of an ulterior purpose and the act of using the process to accomplish a result not within the scope of the proceeding in which it was issued." Bigelow v. Galway, 281 N.W.2d 835, 837 (Minn. 1978). As discussed previously, the Plaintiffs have failed to establish a material fact dispute as to whether Juenger intentionally filed a false police report. Because Plaintiffs have not proffered any evidence that Juenger acted improperly in completing the report, they can not establish a

---

[4] Plaintiffs now admit that the state law claims are made only against Defendant Mower County, and not Defendant Juenger.

prima facie case of abuse of process.

Plaintiff Hartman also alleges a claim of malicious prosecution. Three elements are required to demonstrate this claim: (1) the action was brought without probable cause or reasonable belief that the plaintiff would ultimately prevail on the merits; (2) the action must be instituted and prosecuted with malicious intent; and (3) the action must terminate in favor of defendant. Dunham v. Roer, 708 N.W.2d 552, 569 (Minn. Ct. App. 2006) (citation omitted). As previously discussed, sufficient probable cause existed to bring criminal charges against Hartman, even discounting the inaccuracies in Juenger's report. Moreover, no evidence has been proffered to support that Juenger or Mower County acted with malicious intent against Hartman.

Finally, Hartman brings a claim of negligent infliction of emotional distress. "To establish a claim for negligent infliction of emotional distress, a plaintiff must ordinarily show she (1) was within a zone of danger of physical impact; (2) reasonably feared for her own safety; and (3) suffered severe emotional distress with attendant physical manifestations." Stead-Bowers v. Langley, 636 N.W.2d 334, 343 (Minn. Ct. App. 2001), citing K.A.C. v. Benson, 527 N.W.2d 553, 557 (Minn. 1995). "If a plaintiff cannot show a direct invasion of her rights, such as defamation, malicious prosecution, or other willful, wanton, or malicious conduct, she must demonstrate that she is within a 'zone of danger.'" Id. (citation omitted). Finally, a physical manifestation of emotion distress is generally required for recovery. Soucek v. Banham, 503 N.W.2d 153, 164 (Minn. Ct. App. 1993). In the instant action, Hartman seeks to recover under the malicious prosecution exception to the zone of danger requirement. However, as previously determined, Hartman is unable to demonstrate malicious prosecution. Furthermore, her claimed physical manifestations of sleep disturbances, hypervigilance, and distrust of the law do not

constitute symptoms sufficient to demonstrate severe emotional distress.  Hartman Dep. at 110-11.  Consequently, Defendants' Motions are granted.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants Jon Juenger and Mower County's Motions for Summary Judgment [Docket No. 14 (Civil No. 05-641), Docket No. 11 (Civil No. 05-1873)] are **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

      s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  August 22, 2006.